UNITED STATES DISTRICT COURT                                 b
WESTERN DISTRICT OF LOUISIANA
ALEXANDRIA DIVISION

KYLE SMITH HAUENSTEIN                 CIVIL ACTION NO. 1:14-CV-03188

VERSUS                                CHIEF JUDGE DRELL

RAPIDES PARISH SHERIFF'S              MAGISTRATE JUDGE PEREZ-MONTES
DEPT., et al.

---

## REPORT AND RECOMMENDATION

### I.    Background

####    A.    Procedural Background

Before the Court is a civil rights complaint filed pursuant to 42 U.S.C. § 1983,

*in forma pauperis*, by Plaintiff Kyle Smith Hauenstein ("Hauenstein") on November

3, 2014 (Doc. 1) and amended on January 29, 2015 (Doc. 8), and March 28, 2016 (Doc.

60).   Hauenstein also alleges supplemental state law claims for negligence.   The

remaining defendants are Rapides Parish Sheriff William Hilton ("Hilton") and Pat

Ashley ("Ashley") (Assistant Warden at the Rapides Parish Detention Center I), in

both their individual and official capacities.[1]

Hauenstein contends that, while he was confined in RPDC I in March 2014,

defendants delayed appropriate medical care for an infection on his right foot from

March 14, 2014 to about April 11, 2014 (Doc. 32-1, pp. 41, 47/100; Doc. 32-3, p. 1/10).

Hauenstein contends that, as a result, he went to the emergency room visit in April

---

[1] Since Plaintiff did not specify whether he is suing Defendants in their individual or official capacities,
the Court presumes that he is suing them in both capacities.

2014, had three surgeries including amputation of his right big toe, had kidney failure, and underwent dialysis treatments. Hauenstein seeks a jury trial, monetary damages, costs, and attorney fees.

Defendants answered the complaints (Docs. 13, 64), and filed a motion for summary judgment (Doc. 36). Hauenstein was granted an extension of time (until April 1, 2016) to file a response to Defendants' motion for summary judgment (Doc. 47). Hauenstein then amended his complaint (Doc. 60), and Defendants were given through May 23, 2016 to supplement their motion for summary judgment (Doc. 59). Hauenstein asked for another extension of time to respond to the original motion for summary judgment, which was denied as moot (Doc. 63) since he would have additional time in the Notice of Motion Setting when Defendants supplemented their motion for summary judgment.

However, Defendants did not supplement their motion for summary judgment,[2] Hauenstein did not respond to the motion, and a Report and Recommendation was filed, recommending a motion for summary judgment be granted in favor of Warden Ashley, but not for Sheriff Hilton. Defendants then filed a second motion for summary judgment asking for a summary judgment in favor of Sheriff Hilton. Hauenstein filed a response to Defendants' second motion for summary judgment (Doc. 78), to which Defendants replied (Doc. 79).

---

[2] Defendants appear to contend the extension of the dispositive motion deadline affected their previously filed motion for summary judgment. It did not. Defendants were still responsible for following through with their first motion within the deadlines set for it.

After the second motion for summary judgment was filed, the District Judge dismissed the first motion for summary judgment as moot.  The parties then filed a joint motion to voluntarily dismiss Hauenstein's claims against Warden Ashley (Doc. 85) that was granted (Doc. 88).  Defendants' second motion for summary judgment is now before the Court for disposition.

### B.   Hauenstein's Factual Allegations

Hauenstein alleges in his amended complaint (Doc. 60) that, in March and April 2014, he was a Louisiana Department of Corrections ("DOC") inmate housed in the Rapides Parish Detention Center I ("RPDC I") in Alexandria, Louisiana. Hauenstein was still a pretrial detainee at that time.[3]  On March 14, 2014, Hauenstein noticed a sore on his right foot, behind his big toe, that appeared to be infected.  Hauenstein alleges he filled out a sick call form that day and a medic referred to as "Dr. Barry" examined his foot the next day.

Hauenstein explained he had stepped on something that was stuck in his foot. The medic tried unsuccessfully to dig out the foreign object and prescribed antibiotics for seven days.  The sore grew and developed a hole in the center of it, and Hauenstein began to run a fever.  After Hauenstein began to have difficulty walking on his right foot, he filled out a sick call form to see the medic again.  Hauenstein alleges he continued to fill out sick call forms every day, but he did never saw the medic again. Hauenstein contends his foot secreted green pus and smelled foul, he could not walk, and he was in extreme pain.

---

[3] Hauenstein was convicted and sentenced on May 7, 2014 (Doc. 15-2, pp. 18-21/118).

Hauenstein alleges the guards advised him to have his family call the warden's office and complain about the lack of medical care.  The area around the sore on Hauenstein's foot began to turn black and he could not sleep well.  About two weeks after he saw "Barry" on March 14, Hauenstein told his parents about his medical problem and his mother called the warden's office.  Assistant Warden Ashley visited Hauenstein about one hour later (Doc. 60; Doc. 36-4, p. 19/41).  Ashley immediately sent Hauenstein to the emergency room (Doc. 60; Doc. 36-4, p. 19/41).

At the hospital, a piece of metal was extracted from Hauenstein's foot and he was given IV antibiotics, but his kidneys shut down and he was placed on dialysis.  The big toe on Hauenstein's right foot was later amputated.

## II.   <u>Law and Analysis</u>

### A.   <u>The law applicable to summary judgment.</u>

Under Rule 56 of the Federal Rules of Civil Procedure, a court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Paragraph (e) of Rule 56 also provides the following:

> If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:
> (1) give an opportunity to properly support or address the fact;
> (2) consider the fact undisputed for purposes of the motion;
> (3) grant summary judgment if the motion and supporting materials--including the facts considered undisputed--show that the movant is entitled to it; or
> (4) issue any other appropriate order.[4]

---

[4] Local Rule 56.2W (formerly 2.10W) also provides that all material facts set forth in a statement of undisputed facts submitted by the moving party will be deemed admitted unless the opposing party controverts those facts.

"A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" See <u>Hefren v. McDermott, Inc.</u>, 820 F.3d 767, 771 (5th Cir. 2016) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986)).  In deciding a motion for summary judgment, a court must construe all facts and draw all inferences in the light most favorable to the non-movant.  See <u>Dillon v. Rogers</u>, 596 F.3d 260, 266 (5th Cir. 2010).  However, a mere scintilla of evidence is insufficient to defeat a motion for summary judgment. See  <u>Stewart v. Murphy</u>, 174 F.3d 530, 533 (5th Cir. 1999).

## B.   <u>The law applicable to qualified immunity.</u>

Sheriff Hilton contends he is entitled to qualified immunity.  The defense of qualified immunity protects a public official from both litigation and liability, absent a showing that the official violated a constitutional right that was clearly established at the time of the incident.  See <u>Woods v. Smith</u>, 60 F.3d 1161, 1164 (5th Cir. 1995), cert. den., 516 U.S. 1084 (1996).

Invocation of the qualified immunity defense shifts the burdens of proof in federal civil rights lawsuits brought against public officials for actions or omissions attending their performance of official duties:

> The defendant official must initially plead his good faith and establish that he was acting within the scope of his discretionary authority. Once the defendant has done so, the burden shifts to the plaintiff to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law.

See <u>Bazan v. Hidalgo County</u>, 246 F.3d 481, 489 (5th Cir. 2001) (citing <u>Salas v. Carpenter</u>, 980 F.2d 299, 306 (5th Cir. 1992)).

The bifurcated test for qualified immunity is: (1) whether the plaintiff has alleged a violation of a clearly established constitutional right; and, (2) if so, whether the defendant's conduct was objectively unreasonable in the light of the clearly established law at the time of the incident.  See Hare v. City of Corinth, 135 F.3d 320, 325 (5th Cir. 1998), and cases cited therein.

The first step is to determine whether the plaintiff has alleged violation of a clearly established constitutional right.  This analysis is made under the currently applicable constitutional standards.  See Hare, 135 F.3d at 325.  A constitutional right is clearly established if, in light of pre-existing law, the unlawfulness is apparent.  Officials must observe general, well-developed legal principles.  See Doe v. Taylor Independent School Dist., 15 F.3d 443, 445 (5th Cir. 1994), cert. den., 513 U.S. 815 (1994).

Hauenstein's constitutional right to adequate medical care was clearly established in 2015.  See Easter v. Powell, 467 F.3d 459, 463 (5th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)).  The second prong, objective reasonableness, is a question of law.  The analysis for objective reasonableness is different from that for deliberate indifference (the subjective test for addressing the merits).  For qualified immunity, the subjective deliberate indifference standard serves only to demonstrate the clearly established law in effect at the time of the incident and, under that standard (the minimum standard not to be deliberately indifferent), the actions of the individual defendants are examined to determine

whether, as a matter of law, they were objectively unreasonable.  Hare, 135 F.3d at 328.

The qualified immunity doctrine does not protect an official whose subjective intent was to harm the plaintiff, regardless of the objective state of the law at the time of his conduct.  See Douthit v. Jones, 619 F.2d 527, 533 (5th Cir. 1980).  A party seeking to avoid a qualified immunity defense must prove that the official either actually intended to do harm, or took an action which, although not intended to do harm, was so likely to produce injury that the harm was substantially certain to result.  See Douthit, 619 F.2d at 533.

Finally, the defense of qualified immunity is not available to a defendant sued in his official capacity.  A suit brought against a defendant in his official capacity is, effectively, a suit against the governmental unit that employs the defendant.  See Monell v. Dept. of Social Services, 436 U.S. 658, 690 n. 55 (1978).[5]  Municipalities are not entitled to qualified immunity.  See Owen v. City of Independence, Mo., 445 U.S. 622, 650 (1980).  A sheriff sued in his official capacity is also not entitled to qualified immunity.  Batiste v. Theriot, 458 Fed. Appx. 351, 358 (5th Cir. 2012); Brooks v. George Cty., Miss., 84 F.3d 157, 165 (5th Cir. 1996), cert. den., 519 U.S. 948 (1996).

C.    **The constitutional right to adequate medical care in prison.**

The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  It is settled that the treatment a prisoner receives in prison

---

[5] Municipal liability under §1983 attaches where, and only where, a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question.  See Pembaur v. City of Cincinnati, 475 U.S. 469, 484 (1986).

and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment. See Farmer v. Brennan, 511 U.S. 825, 832 (1994). Although the Eighth Amendment does not, by its precise words, mandate a certain level of medical care for prisoners, the Supreme Court has interpreted it as imposing a duty on prison officials to ensure that inmates receive *adequate* medical care. See Easter, 467 F.3d at 463 (citing Farmer, 511 U.S. at 832). The fact that the medical care given is not the best that money can buy does not amount to deliberate indifference. See Mayweather v. Foti, 958 F .2d 91 (5th Cir. 1992); Ruiz v. Estelle, 679 F.2d 1115, 1149 (5th Cir. 1982), amended in part and vacated in part on other grounds, 688 F.2d 266, 267 (5th Cir. 1982).

Under the Eighth Amendment, a lack of proper inmate medical care can be "cruel and unusual punishment" only if it is "sufficiently harmful to evidence deliberate indifference to serious medical needs." See Estelle v. Gamble, 429 U.S. 97, 106 (1976). First, the deprivation must be, objectively, sufficiently serious and the prison official's act or omission must result in the denial of the minimum civilized measure of life's necessities. Second, a prison official must have a sufficiently culpable state of mind–i.e. deliberate indifference to a prisoner's constitutional rights–to bear § 1983 liability. See Farmer, 511 U.S. at 834. The Supreme Court defined "deliberate indifference" as "subjective recklessness", or, in other words, a conscious disregard of a substantial risk of serious harm. See Farmer, 511 U.S. at 839. A serious medical need is one for which treatment has been recommended or for

which the need is so apparent that even laymen would recognize that care is required.
See Gobert v. Caldwell, 463 F.3d 339, 345 (5th Cir. 2006).

A prison official is deliberately indifferent to serious medical needs of prisoners
if he intentionally denies or delays access to medical care.  See Walker v. Butler, 967
F.2d 176, 178 (5th Cir. 1992); Thompkins v. Belt, 828 F.2d 298, 303 (5th Cir. 1987).
A prison inmate can demonstrate an Eighth Amendment violation by showing that a
prison official refused to treat him, ignored his complaints, intentionally treated him
incorrectly, or engaged in any similar conduct that would clearly evince a wanton
disregard for any serious medical needs.  See Easter v. Powell, 467 F.3d 459, 463-464
(5th Cir. 2006) (citing Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 756
(5th Cir. 2001)).

Access to emergency medical care falls within the "minimal civilized measure
of life's necessities." See Wilson v. Seiter, 501 U.S. 294, 298 (1991).  When a
gatekeeper to emergency care knowingly disregards a prisoner's complaints, he acts
with deliberate indifference to that prison's medical needs.  See Rodrigue v.
Morehouse Det. Ctr., 2012 WL 4483438, at *6 (W.D. La. 2012), aff'd, 557 Fed.Appx.
341 (5th Cir. 2014) (prison officials were not entitled to qualified immunity where
they ignored prisoner's requests for medical care for his obviously dire condition).  In
Rodrigue, the prisoner's only medical care provider was a licensed practical nurse
who treated his repeated vomiting, caused by a ruptured appendix, with nausea
medication and an enema.  See Rodrigue v. Morehouse Det. Ctr., 2012 WL 4483438,
at *6.  By the time Rodrigue was sent to the hospital, 10 days after the onset of his

symptoms, sepsis had set in and he required three surgeries and an extended recovery period.  See Rodrigue, 557 Fed.Appx. at 342.  The district court and the Fifth Circuit found defendant had been deliberately indifferent to Rodrigue's obviously serious need for medical care and were not entitled to qualified immunity.  See Rodrigue v. Morehouse Det. Ctr., 2012 WL 4483438, at *9, *12, aff'd, 557 Fed.Appx. at 347.

### D.    Sheriff Hilton's liability in his individual and official capacities.

Hauenstein contends Sheriff Hilton is liable to him in his individual capacity. In his individual capacity, the doctrine of respondeat superior, which makes an employer or supervisor liable for an employee's alleged tort, is unavailable in suits under 42 U.S.C. §1983.  See Thompkins, 828 F.2d at 303.  Supervisory officials cannot be held vicariously liable for their subordinates' actions.  Supervisory officials may be held liable only if: (1) they affirmatively participate in acts that cause constitutional deprivation; or (2) implement unconstitutional policies that cause plaintiff's injury. See Mouille v. City of Live Oak, Tex., 977 F.2d 924, 929 (5th Cir. 1992), cert. den., 508 U.S. 951 (1993); Thompkins, 828 F.2d at 303.

The sheriff is the "keeper of the public jail of his parish."  See La. R.S. 15:704; Howard v. Fortenberry, 723 F.2d 1206, 1210 n.9 (5th Cir. 1984), vacated in part on other grounds, 728 F.2d 712 (5th Cir. 1984).  When a sheriff is in charge of a parish jail, he is responsible for such matters as the training of personnel and the safety and medical care of inmates.  See Howard, 723 F.2d at 1210.  Under Louisiana law, the sheriff has the duty of operating the jail and seeing to it that the prisoners are

properly cared for.  See Thompkins v. Belt, 828 F.2d 298, 304 n.8 (5th Cir. 1987)

(citing O'Quinn v. Manuel, 773 F.2d 605, 609 (5th Cir. 1985)); see also Amiss v.

Dumas, 411 So.2d 1137, 1141 (La. App. 1st Cir. 1982), writ den., 415 So.2d 940 (La.

1982).[6]

A sheriff not personally involved in the acts that deprived the plaintiff of his

constitutional rights is liable under section 1983 if: (1) the sheriff failed to train or

supervise the officers involved; (2) there is a causal connection between the alleged

failure to supervise or train and the alleged violation of the plaintiff's rights; and (3)

the failure to train or supervise constituted deliberate indifference to the plaintiff's

constitutional rights.  See Thompson v. Upshur Cty., Tx., 245 F.3d 447, 459 (5th Cir.

2001).

Hauenstein also contends Sheriff Hilton is liable to him in his official capacity.

A suit against a Louisiana sheriff in his official capacity is a suit against the law

enforcement district of which he is the head.  See La. R.S. 13:5901.[7]  A Law

---

[6] La. R.S. 13:5901, et seq. (formerly La. R.S. 33:9001, et seq.) empowers the sheriff to raise revenues to finance his facilities and services through the creation of a continuing legal entity in each parish known as a law enforcement district, whose corporate existence survives the term of office of any individual sheriff.  See Prator v. Caddo Parish, 38,085 (La. App. 2 Cir. 1/28/04), 865 So.2d 932, 936.

[7] La. R.S. 13:5912 specifically creates the Rapides Parish Law Enforcement District:

The Rapides Parish Law Enforcement District, a political subdivision as defined in Article VI, Section 44 of the Constitution of Louisiana, is hereby additionally authorized to construct law enforcement and sheriff's facilities, including but not limited to a jail or prison, located wholly within the territorial jurisdiction of the district. Said district is further authorized to incur debt and issue general obligation bonds for the purpose of financing such construction subject to approval of the State Bond Commission and approval of a majority of the electors of the district voting in an election called and held for that purpose. Such bonds shall be issued pursuant to the provisions of Part III of Chapter 4 of Title 39 of the Louisiana Revised Statutes of 1950 and shall be sold pursuant to the provisions of Chapter 13 of said Title 39.

Enforcement District is a taxing entity and, for all practical purposes, a Law Enforcement District is the Sheriff.   See Law Enforcement District of Parish of Avoyelles v. Avoyelles Parish Police Jury, 98-996 (La. App. 3d Cir. 2/3/99), 736 So.2d 842, writ den., 99-635 (La. 4/23/99), 742 So.2d 892.

Under Louisiana law, the sheriff is a final policymaker.  See Craig v. St. Martin Parish Sheriff, 861 F.Supp. 1290, 1300 (W.D. La. 1994) (citing La. Const. Art. 5, § 27, "[The sheriff] shall be the chief law enforcement officer in the parish."); see also McNeese v. State of Louisiana, 2006 WL 1751055 (W.D. La .2006).  As the chief executive officer for the Rapides Parish Law Enforcement District, the Rapides Parish Sheriff is the independent and final official policymaker for all of the Rapides Parish Law Enforcement District.  La. R.S. 13:5901.

Sheriffs in Louisiana are final policy makers with respect to management of the jail. The Sheriff's policy-making authority over management of the jail is not the result of a delegation from the Parish or any other local governmental entity.   The Sheriff's authority is derived from the state constitution.  See Jones v. St. Tammany Parish Jail, 4 F.Supp.2d 606, 613 (E.D. La. 1998) (citing La. Const. art. 5 § 27); see also Craig v. St. Martin Parish Sheriff, 861 F.Supp. 1290, 1300 (W.D. La. 1994) (citing La. Const. Art. 5, § 27); McNeese v. State of Louisiana, 2006 WL 1751055 (W.D. La. 2006).  The Sheriff also controls the inmates of the jail, the employees of the jail, and the daily operation of the jail.  See Jones, 4 F.Supp.2d at 613 (citing La. R.S. 33:1435; La. R.S. 15:704; O'Quinn, 773 F.2d at 609).

If there is a policy or custom that evinces deliberate indifference, deliberate indifference is treated as tantamount to intent, so that inaction by a policymaker deliberately indifferent to a substantial risk of harm is equivalent to the intentional action that setting policy presupposes. See Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 419 (1997).  In Burge v. Parish of St. Tammany, 187 F.3d 452, 471 (5th Cir. 1999), the Fifth Circuit explained that the official policy requirement may be met in at least three different ways: (1) when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy; (2) where no official policy was announced or promulgated but the action of the policymaker itself violated a constitutional right; and (3) even when the policymaker fails to act affirmatively at all, if the need to take some action to control the agents of the local governmental entity is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.

Therefore, Hauenstein must prove a constitutionally deficient policy or custom in order to prove Sheriff Hilton is liable to him in both his individual and official capacities.

### E.   Sheriff Hilton is not entitled to summary judgment regarding Hauenstein's claims under federal law.

Hauenstein alleges Sheriff Hilton failed to provide him with timely access to a physician while he was in the RPDC, in violation of federal and Louisiana law.

1.   __There are genuine issues of material fact as to whether__
__Hauenstein received reasonably adequate medical care.__

Defendants concede in their brief (Doc. 36, pp. 5, 7-8/27) that RPDC inmates are treated by "coroner's office employees" and that Hauenstein was treated by EMT/Paramedic Barry Harrington, who is from the "coroner's office."  Defendants further concede there are no RPDC medical records or medical records kept by the coroner's employees showing the treatment provided to Hauenstein at DC-1 (Doc. 36-1, p. 7/27).  Defendants have not submitted an affidavit or other evidence from Barry Harrington, so the only evidence as to the treatment Harrington rendered to Hauenstein is Hauenstein's statements.

Acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs of inmates constitute cruel and unusual punishment.  The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves, nor the therapy that Medicare or Medicaid provide for the aged or the needy. It prohibits only deliberate indifference to serious medical needs.  See Ruiz, 679 F.2d at 1149.  The standard of care imposed by Louisiana law upon the confining authority is that medical services be adequate and reasonable. See Landry v. E. Baton Rouge Par. Sheriff's Office, 2015-0733 (La.App. 1st Cir. 3/9/15), 2015 wl 1033767, writ granted, 2015-681 (La. 6/30/15), 168 So.3d 378 (citing Jacoby v. State, 434 So.2d 570, 573 (La.App. 1st Cir.), writ den., 441 So.2d 771 (La. 1983)).

Generally, although it is the sheriff and not the municipality that has the duty to provide day-to-day medical care for the prisoners, the municipality is responsible

for the annual appointment of a licensed physician or a qualified health care provider to care for the prisoners whenever they are sick.  See Amiss, 411 So.2d at 1140 (citing La. R.S. 15:703).[8]

In Landry, 168 So.3d at 379, the plaintiff (Landry) was in the custody of the East Baton Rouge Sheriff for 18 days.  Shortly after he was released, Landry died.  Although the Sheriff transported Landry for his dialysis treatments, Landry was not given his medications (for his kidneys, seizures, and blood clotting disorder) while he was in jail.  Landry, 168 So.3d at 379, 382.   The trial and appellate courts held in favor of the Sheriff and found negligence on the part of Prison Medical Services, the prison medical services provider.  The Supreme Court reversed the judgment as to the Sheriff.

In a concurring opinion, Justice Knoll stated that the Sheriff does not have the authority to wholly abdicate his responsibility for the well-being of the inmates.  See Landry, 168 So.3d at 381.  The relevant provisions of La. R.S. 15:703, which delegate

---

[8] La. Rev. Stat. Ann. § 15:703 states in pertinent part:
> A.  The governing authority of each parish shall appoint annually a physician who shall attend the prisoners who are confined in parish jails whenever they are sick. His salary shall be fixed by the governing authority. Any physician so appointed shall be licensed as provided in R.S. 37:1271 and shall be a qualified health care provider in accordance with R.S. 40:1231.2 [the Louisiana Medical Malpractice Act].

La. Rev. Stat. Ann. § 37:1271 states in pertinent part:
> A. No person shall practice medicine as defined herein until he possesses a duly recorded license issued under this Part or a permit or registration as provided for herein.
> B. (1) No person shall practice or attempt to practice medicine across state lines without first complying with the provisions of this Part and without being a holder of either an unrestricted license to practice medicine in Louisiana or a telemedicine license entitling him to practice medicine pursuant to R.S. 37:1276.1.

responsibility for inmates' medical care to "the governing authority" and "the prison physician," did not by themselves allow Landry's claims to be defeated via summary judgment.  See Landry, 168 So.3d at 382.  Justice Knoll further stated that:

> [I]f members of the Sheriff's Office were told by Mr. Turner and his sister that Prison Medical Services had failed to provide *any* prescription medicine, the Sheriff's Office should have timely ensured Prison Medical Services was aware of this asserted need. ...If any members of the Sheriff's Office knew or should have known of the content of this discussion or of similar responses to requests for prescription medicine, then the Sheriff's Office [sic] failure to take action when faced with Prison Medical Services' decision to ignore Mr. Turner's urgent request for medical care may well fall below the standard of reasonable care. Thus, genuine issues of material fact remain as to whether the defendant breached its duty to Mr. Turner.

See Landry, 168 So.3d at 382.

As previously discussed, it is not clear who is responsible for appointment of a physician to attend to inmates in DC-1.  The Rapides Parish Sheriff has taken on many of the duties previously allocated to the Police Jury due to funding through the Law Enforcement District.  In any event, as discussed by Justice Knoll, even if the Policy Jury is responsible for appointing the parish prison physician, the Sheriff is still responsible for the care and well-being of the parish inmates, which includes making sure they receive necessary medical attention.

Sheriff Hilton contends the "coroner's employees" were "appointed" to provide healthcare to the inmates of the RPDC.  Defendants' statement of material facts shows that the coroner's employees are EMT/Paramedics.  EMT/Paramedics are not "qualified health care providers" as required by La. R.S. 15:703 and defined by La. R.S. 40:1231.1(10).  State law provides that a licensed *physician* shall be appointed

16

annually for each parish, who shall attend the prisoners confined in the parish jails when they are sick.   See La.R.S. 15:703.   EMT/Paramedics do not satisfy the requirements of § 703.  It is not clear whether Sheriff Hilton or the Rapides Parish Police Jury was responsible for appointing and paying for a physician for the prisoners in DC-1.  However, at the very least, Sheriff Hilton was aware there was no physician to provide medical care for sick prisoners under his care, as required by state law.

As in Landry, Sheriff Hilton claims the coroner's employees were responsible for the inmates' medical care, and that he has no authority over them.  However, the Sheriff has an Eighth Amendment responsibility to provide for the well-being of the inmates in his care.  If the coroner's employees were not responding to sick call requests – a circumstance the Sheriff's employees apparently knew about – Sheriff Hilton had a duty to ensure that Hauenstein was given medical care.  As in Landry, the failure of the Sheriff's employees to take action when faced with coroner's employees' decision to ignore Hauenstein's urgent request for medical care may well fall below the standard of reasonable care. Thus, genuine issues of material fact remain as to whether the Sheriff Hilton breached his duty to Hauenstein.

Moreover, the RPDC procedure for sick inmates to request medical care was, apparently, to fill out a sick call request when medical attention was required. Defendants do not contend that Hauenstein did not follow the procedure for submitting sick call requests.  Obviously, that procedure is inadequate if there are no

qualified health care providers, or if the health care provider does not respond to the request.

In his second motion for summary judgment, Hilton supplemented his Statement of Material Facts to show the procedure in place for an RPDC inmate to receive medical care. Hilton shows that Barry Harrington and Michael Doiron are "Emergency Medical Technician/Paramedics" who work for both the coroner's office and as "health care providers" for the Rapides Parish Detention Centers. Hilton contends the EMT/Paramedics make all decisions concerning an inmate's medical decisions and may consult with Dr. Brian, the coroner. Doiron states in his affidavit that the EMT/Paramedics examine the inmates, decide what medical treatment is needed, and determine whether an inmate should be sent to "outside" health care providers (Doc. 74-6).

The Louisiana Department of Health follows the National Highway Traffic Safety Administration's "National EMS Scope of Practice Model" as the foundation for the Scope of Practice in Louisiana.[9] The National EMS Scope of Practice Model states in pertinent part:

> The *National EMS Scope of Practice Model* defines the practice of EMS personnel. EMS personnel are unique health care professionals in that they provide medical care and transportation in an out-of-hospital setting with medical oversight. EMS personnel are not independent practitioners. EMS provides out-of-hospital medical care to those with perceived urgent needs. It is a component of the overall health care system. EMS delivers care as part of a system intended to attenuate the morbidity and mortality associated with sudden illnesses and injury.
>
> The primary focus of the Emergency Medical Technician is to provide basic emergency medical care and transportation for critical and

---

[9] See http://new.dhh.louisiana.gov/index.cfm/faq/category/97.

emergent patients who access the emergency medical system. This individual possesses the basic knowledge and skills necessary to provide patient care and transportation. Emergency Medical Technicians function as part of a comprehensive EMS response, under medical oversight. Emergency Medical Technicians perform interventions with the basic equipment typically found on an ambulance. The Emergency Medical Technician is a link from the scene to the emergency health care system.

The Paramedic is an allied health professional whose primary focus is to provide advanced emergency medical care for critical and emergent patients who access the emergency medical system. This individual possesses the complex knowledge and skills necessary to provide patient care and transportation. Paramedics function as part of a comprehensive EMS response, under medical oversight. Paramedics perform interventions with the basic and advanced equipment typically found on an ambulance. The Paramedic is a link from the scene into the health care system.

In Rapides Parish, according to Defendants, EMT/Paramedics are not simply evaluating, stabilizing, and sending sick inmates out for treatment.  Rather, they are themselves *independently* diagnosing and treating inmates.  Although Doiron states in his affidavit that Dr. Brian is "available" to him for consultation, the legal standard to EMT-Paramedics is for a physician to *directly* supervise them, and patients are to be taken elsewhere for medical care from a physician or nurse.   Unsupervised diagnosis and treatment of sick inmates is outside the scope of EMT/Paramedic training, certification, and licensure.  See La. R.S. 40:1131, *et seq.*  It is noteworthy that, according to the evidence before the Court, Dr. Brian was not involved in the evaluation and treatment of Hauenstein's infection.  Nowhere in this record is Dr. Brian mentioned except to state that he is the coroner and is Doiron's and Harrington's other employer.

Sheriff Hilton contends that employment of EMT/Paramedics to provide health care for inmates meets an unspecified "industry standard."  Even if the Court were aware of such an industry or a standard – which it is not – the Court is bound to apply statutory and constitutional standards.[10]  Employing EMT/Paramedics to diagnose and treat non-emergent medical issues may – and likely does in this case – fall short of statutory and constitutional standards.  See Humphrey v. State ex rel. Dept. of Corrections, 2011-2272 (La. App. 1st Cir. 6/13/12), 2012 WL 2155237, *3 (the State's duty to provide reasonable medical care was not met by using EMTs to address the non-emergent medical needs of the Angola prison population).[11]

There are genuine issues of material fact as to whether Hauenstein received reasonably adequate medical care for the foreign object and infection in his foot at the RPDC during the weeks before he was sent to the emergency room.  And there are genuine issues of material fact as to whether having EMT/Paramedics provide medical diagnoses and treatment[12] for inmates with serious medical needs satisfies

---

[10] "The function of [Emergency Medical Services] is not to examine, diagnose, and treat patients, but instead to transport patients who need help to the emergency department."  Phillips v. Roane County, Tenn., 534 F.3d 531, 542 (6th Cir. 2008).

[11] Additionally, the RPDC apparently does not keep medical records for the medical care provided for its inmates.  To this Court's knowledge, that practice does not comport with the practices of any other prison in this judicial division.

[12] Louisiana law does not license EMTs to diagnose medical conditions or to treat them without the direct oversight of a licensed physician.  La. Rev. Stat. Ann. § 40:1133.14(A) provides:
   (1) A licensed emergency medical services practitioner may perform any of the following functions:
      (a) Services, treatment, and procedures consistent with national EMS education standards that have been approved and adopted by the bureau, and to the extent that he has been trained to perform such services.
      (b) Administration of other drugs or procedures for which the licensed emergency medical services practitioner has received training, license, and approval by the commission and which may be considered necessary by the ordering physician.

20

statutory and constitutional standards. Summary judgment in favor of Defendants is unwarranted.

>    **2.** **<u>There are genuine issues of material fact as to whether the delay in Hauenstein's medical care is attributable to Sheriff Hilton's failure to provide reasonably adequate medical care at the prison, failure to implement policies for providing medical care for inmates with serious medical needs, and/or failure to train guards to obtain medical care for inmates with serious medical needs</u>.**

Sheriff Hilton contends he did not employ the EMT/Paramedics. However, to the extent that Doiron and Harrington were employed to treat sick RPDC inmates, the Sheriff and/or the Police Jury are responsible for the decision to employ their services. In addition, regardless of whether Sheriff Hilton actually employed the EMT/Paramedics, he is certainly responsible to provide reasonably adequate medical care to the inmates in his prisons.

In this case, genuine issues of fact remain as to whether Sheriff Hilton ensured adequate medical care was available to Hauenstein. Sheriff Hilton was apparently aware that two EMT/Paramedics from the coroner's officer were providing medical care and making medical decisions regarding RPDC inmates, despite the fact that EMT/Paramedics are not trained or licensed to diagnose, treat, and prescribe. It was likely that an inmate, like Hauenstein, would have a medical problem which exceeded the scope of an EMT/Paramedic's training. The EMT/Paramedics were supposed to

---

(2) The functions authorized by Paragraph (1) of this Subsection may be performed by the licensed emergency medical services practitioner while he is caring for a patient or at the scene of a medical or other emergency *where voice contact is established with a physician and under the physician's order; or under a protocol that has been approved* by the local parish medical society or the emergency medical services practitioner's medical director, *until voice communication with the physician is established.*

send inmates for outside medical care as needed.  But that decision was left entirely to the EMT/Paramedics.  And that decision requires diagnostic training and skill which, again, would likely exceed the training of an EMT/Paramedic in at least some situations.

This case may present such a situation, at least in light of the evidence before the Court.  EMT/Paramedic Barry Harrington apparently "dug" for the piece of metal in Hauenstein's foot *but did not remove it*, left him with ten days of antibiotics, did not refer Hauenstein for outside treatment, and did not respond to Hauenstein's requests for outside treatment when his foot worsened.

Further, the Inmate Handbook for the RPDC states that inmates will be sent to the Huey P. Long Hospital on weekends and for emergencies (Doc. 36-6, p. 8/46).  That procedure does not appear to have been followed for Hauenstein.   Even if the procedures had been correctly followed, there are genuine issues of material fact regarding whether the procedures were adequate to provide for the reasonable medical care of RPDC inmates.  See Landry, 168 So.3d at 382.

The involvement of the RPDC guards – who are, of course, not health care providers – does not alter this conclusion.   The guards were made aware of Hauenstein's medical problem.   Instead of reporting the problem themselves, however, the guards told Hauenstein to have his family contact the warden.  This decision does not support summary judgment.  Rather, it raises the possibilities of

22

inadequate procedures or training for addressing the serious medical needs of inmates.  Either possibility precludes summary judgment in Sheriff Hilton's favor.[13]

Defendants further argue that Hauenstein should have filed a grievance when he did not receive his requested medical care.  However, a grievance is not a normal procedure to obtain medical care.  The Inmate Handbook does not set forth a specific grievance procedure for RPDC, so the Louisiana statutory provisions for inmate administrative remedies are applicable.[14]  Those remedies give the Warden 40 days to respond to a first step grievance.  Hauenstein could have died from the infection if he had to wait that long for a response.  It should not be necessary to use the grievance process to obtain medical care for a serious medical need, and grievance procedures are wholly inadequate when emergency medical care is required.

---

[13] Failure to train may be a policy for purposes of 42 U.S.C. § 1983 only if such failure reflects a deliberate or conscious choice by a municipality.  See Kitchen v. Dallas Cty., Tex., 759 F.3d 468, 484 (5th Cir. 2014) (citing City of Canton v. Harris, 489 U.S. 378, 389 (1989).  Failure to properly train may also be a policy if, in light of the duties assigned to specific officers or employees, the need for more or different training is so obvious, and the inadequacy is so likely to result in the violation of constitutional rights that the policymakers can reasonably be said to have been deliberately indifferent to the need.  See id. at 484 (citing City of Canton, 489 U.S. at 390).

[14] La. Adult Administrative Remedy Services–La. A.D.C. 22:I.325(G)(1):

    1.  First Step (Time Limit 40 days)
        The inmate commences the process by writing a letter to the warden, in which he briefly sets out the basis for his claim, and the relief sought (refer to Subsection F, "Procedure-Initiation of Process" for the requirements of the letter). The inmate should make a copy of his letter of complaint and retain it for his own records. The original letter will become a part of the process, and will not be returned to the inmate. The institution is not responsible for furnishing the inmate with copies of his letter of complaint. This letter should be written to the warden within 90 days of an alleged event. (This requirement may be waived when circumstances warrant. The warden, or his designee, will use reasonable judgment in such matters.) The requests shall be screened by the ARP screening officer and a notice will be sent to the inmate advising that his request is being processed or is being rejected. The warden may assign another staff person to conduct further fact-finding and/or information gathering prior to rendering his response. The warden shall respond to the inmate within 40 days from the date the request is received at the first step.

Sheriff Hilton argues that the loss of Hauenstein's toe is simply the result of his recurring MRSA (methicillin-resistant staphylococcus aureus) infection.  Since no medical records have been provided, however, this argument is not substantiated.  Moreover, the Court is not generally convinced that a staph infection – when treated appropriately – would normally result in an amputation.

Finally, Sheriff Hilton's argument that Hauenstein alleges only an "episodic act or omission" is without merit.  Hauenstein alleges deficient policies or customs regarding the conditions of his confinement, specifically as to the medical (or lack thereof) provided to inmates in the RPDC.

In sum, there are genuine issues of material fact regarding: (1) whether Sheriff Hilton breached his duty to provide reasonably adequate medical care for Hauenstein as an inmate in the RPDC; (2) whether Sheriff Hilton implemented a constitutionally deficient policy of employing EMT/Paramedics to provide medical diagnoses and treatment for inmates at RPDC that was so likely to result in a violation of the constitutional right to medical care as to constitute deliberate indifference to Hauenstein's serious medical needs; (3) whether Sheriff Hilton provided constitutionally deficient training for RPDC guards regarding the need to obtain medical care for inmates with serious medical issues; and (4) whether any such breaches caused Hauenstein to suffer kidney failure and/or have his right big toe amputated.  See Landry, 168 So.3d at 382.  Therefore, Sheriff Hilton's motion for summary judgment, in both his individual and official capacities, should be denied as to Hauenstein's federal claims.

**F.**   **Sheriff Hilton is not entitled to summary judgment regarding Hauenstein's claims under Louisiana law.**

Hauenstein also alleges a state law claim for negligence under La. C.C. Art. 2315, for the delay in providing him medical care.  To prevail on a negligence claim under La. Civil Code arts. 2315 and 2316, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant failed to conform his conduct to the appropriate standard (the breach of duty element); (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and, (5) actual damages (the damages element).  See Brown v. Lee, 94-104 (La. App. 5 Cir. 7/13/94), 639 So.2d 897, 898-899, writ den., 94-2127 (La. 11/18/94), 646 So.2d 378 (citing  Roberts v. Benoit, 605 So.2d 1032 (La. 1992); Fowler v. Roberts, 556 So.2d 1, 4 (La. 1989)).

As discussed above, the standard of care imposed by Louisiana law upon the confining authority is that medical services be adequate and reasonable.  See Landry, 168 So.3d 378.  For the same reasons there are genuine issues of material fact as to Hauenstein's § 1983 claims, there are also genuine issues of material fact under Louisiana law as to whether Sheriff Hilton's policies for providing medical care for the serious medical needs of RPDC inmates caused Hauenstein to suffer kidney failure and amputation of his right big toe.  Therefore, Sheriff Hilton's motion for summary judgment should be denied as to Hauenstein's state law claim as well.

III.   **Conclusion**

Based on the foregoing, IT IS RECOMMENDED that Defendants' motion for summary judgment (Doc. 74) be DENIED AS TO SHERIFF HILTON, in both his individual and official capacities, and as to both the federal and state law claims.

Under the provisions of 28 U.S.C. § 636(b)(1)(c) and Fed.R.Civ.P. 72(b), parties aggrieved by this Report and Recommendation have fourteen (14) calendar days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.   No other briefs (such as supplemental objections, reply briefs, etc.) may be filed.  Providing a courtesy copy of the objection to the undersigned is neither required nor encouraged. Timely objections will be considered by the District Judge before a final ruling.

Failure to file written objections to the proposed findings, conclusions, and recommendations contained in this Report and Recommendation within fourteen (14) days from the date of its service, or within the time frame authorized by Fed.R.Civ.P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Judge, except upon grounds of plain error.

THUS DONE AND SIGNED in chambers in Alexandria, Louisiana, this 6th day of December, 2016.

Joseph H.L. Perez-Montes
United States Magistrate Judge